STATE OF CONNECTICUT *v.* EDDIE COTTON, JR.
(AC 23473)

Dranginis, Flynn and Bishop, Js.

---

[1] The value of the stock has declined significantly since the date of dissolution.

Argued March 31—officially released July 1, 2003

*Alice Osedach-Powers*, assistant public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *John M. Waddock*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Eddie Cotton, Jr., appeals from the judgment of conviction, rendered after a jury trial, of unlawful restraint in the second degree in violation of General Statutes § 53a-96 (a), kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A), two counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and burglary in the first degree in violation of General Statutes § 53a-101 (a) (2). On appeal, the defendant claims that (1) the trial court improperly failed to give the jury instructions on consent and evidence of prior

acts that he had requested, (2) his conviction of separate counts of unlawful restraint in the second degree and kidnapping in the first degree violate constitutional protections against double jeopardy, (3) prosecutorial comments during closing argument deprived him of a fair trial and, (4) there was insufficient evidence to support his conviction of unlawful restraint in the first degree and kidnapping in the first degree. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On September 19, 1999, the victim was invited to dine with the defendant and the defendant's wife, Anita Cotton. The victim was fifty-two years old and partially blind as well as developmentally disabled. Anita Cotton and the victim had been friends for approximately ten years, during which time Anita Cotton had served as the victim's unofficial caretaker. On the evening in question, the defendant picked up the victim at her apartment and drove her to the Cotton home, where the three ate dinner.

After dinner, at approximately 10 p.m., Anita Cotton stated that she was tired and asked the defendant to drive the victim home. En route, on Dixwell Avenue in New Haven, the defendant stopped the car at the side of the road and shut off the engine. He told the victim that he had "liked" her for a long time and asked her to engage in sexual activity with him. The victim declined his advances and requested to be driven home. In response, the defendant unzipped his pants and began to masturbate. The victim admonished him, stating, "that's not right," and again requested to be taken home. The defendant slammed his hands against the steering wheel in anger and resumed driving.

Shortly thereafter, the defendant drove into a parking lot at the Martin Luther King School, also on Dixwell Avenue, and shut off the engine. He leaned over and

attempted to slide his hands between the victim's thighs. The victim requested that he stop and said that she wanted to go home. Ignoring her request, the defendant reached into the victim's blouse and groped her breasts. When the victim resisted, the two "tussled" and "wrestled" inside the car. During the "tussle," the defendant's watchband broke and he frantically searched for it. He then offered the victim $50 for sexual favors. When she refused, he drove the victim to her home.

Upon arrival at the victim's housing complex, the defendant parked in a location that would require the victim to walk downhill in the darkness. She refused his offer to escort her to her apartment. The defendant, however, ignored her rejection and grasped her hand, leading her to her apartment. At its door, he requested to be let inside so that he could use the bathroom, to which the victim responded: "Pee outside." After several more requests, the victim relented and allowed the defendant to use her bathroom.

After the defendant had used the bathroom, he entered the living room where he once again attempted to physically engage the victim, telling her that he "loved" her while kissing and fondling her. In response, she protested, stating that it was "not right" and that "he should go home." When she opened the front door to show him out, the defendant forcefully slammed it shut. He then lifted her and threw her onto the couch.

As the victim protested that it was "not right" and "you're married," the defendant forcefully pulled off her undergarments and subjected her to intercourse. The victim pleaded for the defendant to "get off" of her, but he did not. When the defendant was finished, he counted out $50 in cash and placed it on a table, telling the victim not to disclose the incident to his wife.

Approximately one week later, the victim disclosed the events to Anita Cotton. The women then reported the attacks to the police. As a consequence, the defendant was charged with unlawful restraint in the second degree in violation of § 53a-96 (a), kidnapping in the first degree in violation of § 53a-92 (a) (2) (A), sexual assault in the third degree in violation of § 53a-72a (a) (1) (A), two counts of unlawful restraint in the first degree in violation of § 53a-95 (a), sexual assault in the first degree in violation of § 53a-70 (a) (1) and burglary in the first degree in violation of § 53a-101 (a) (2), and was convicted, after a jury trial, on all seven counts. This appeal followed.

I

The defendant first claims that his state and federal constitutional rights to present a defense and to due process of law were violated when the court failed to deliver the jury instruction on consent that he had requested. We are not persuaded.

"The standard of review for a challenge to the propriety of a jury instruction is well established. [J]ury instructions are to be read as a whole, and instructions claimed to be improper are read in the context of the entire charge. . . . A jury charge is to be considered from the standpoint of its effect on the jury in guiding it to a correct verdict. . . . The test to determine if a jury charge is proper is whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [I]nstructions to the jury need not be in the precise language of a request. . . . Moreover, [j]ury instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury." (Citations omitted; internal quotation marks omitted.)

*McDermott* v. *Calvary Baptist Church*, 263 Conn. 378, 383–84, 819 A.2d 795 (2003).

As a backdrop to the defendant's claim, the following additional evidence was adduced at trial. The defendant and the victim had known each other for approximately ten years. During the two years prior to the September 19, 1999 incident, the defendant had telephoned the victim at home frequently in an attempt to engage her in sexually oriented conversations. On at least one occasion, she had remained on the telephone while the defendant masturbated. The victim did not participate in the conversations, nor did she inform Anita Cotton about them.

On Thanksgiving Day, 1998, the victim joined the defendant and Anita Cotton for dinner and, because of the late hour, Anita Cotton invited the victim to spend the night. At some point during the night, the victim was awakened by the defendant when, naked, he went to the kitchen to get a drink of water. He then approached the victim, put his hands between her thighs, and digitally penetrated her against her wishes. He began to masturbate while fondling the victim's breasts. When he attempted to mount her, the victim resisted and told him, "No." He then offered the victim $200 if she would permit him to perform oral sex on her. She refused, and the defendant continued to masturbate after which he left the room. The victim did not tell Anita Cotton about the incident.

During closing argument, defense counsel argued that the victim's acquiescence in those earlier incidents evinced her ambiguity about the victim's sexual conduct and reasonably could be taken by the defendant as consent to his sexual advances toward her. Consistent with that argument, the defendant submitted the following request to charge the jury on the issue of consent:

"The state must prove beyond a reasonable doubt that the words and conduct of [the victim] clearly communicated to [the defendant] that she did not consent to his behavior. [The defendant] 'cannot be found guilty because of some undisclosed mental reservation on the part of [the victim].' Any mental reservation must have been clearly and unambiguously communicated to [the defendant]. You must consider whether or not 'the words and conduct of the complainant under all the circumstances would justify a reasonable belief that she had consented.' If by her words or conduct the [victim] appeared to have consented to [the defendant's] conduct, [the defendant] must be found not guilty."

The court declined to instruct on consent in the manner requested by the defendant. The court charged instead: "[I]f you find that [the victim] consented to the act of sexual intercourse, you cannot find that the act was compelled. Such consent must have been actual, not simply acquiescence brought about by force, by fear or by shock. The act must have been truly voluntary on the part of the victim. Consent may be expressed or you may find that it is implied from the circumstances that you find exist. Whether there was consent is a question of fact for you to determine." The defendant claims that this instruction on consent impermissibly weakened the state's burden to prove lack of consent beyond a reasonable doubt.

In *State* v. *Smith*, 210 Conn. 132, 554 A.2d 713 (1989), the Supreme Court stated: "While the word 'consent' is commonly regarded as referring to the state of mind of the complainant in a sexual assault case, it cannot be viewed as a wholly subjective concept. Although the actual state of mind of the actor in a criminal case may in many instances be the issue upon which culpability depends, a defendant is not chargeable with knowledge of the internal workings of the minds of others except

to the extent that he should reasonably have gained such knowledge from his observations of their conduct. The law of contract has come to recognize that a true 'meeting of the minds' is no longer essential to the formation of a contract and that rights and obligations may arise from acts of the parties, usually their words, upon which a reasonable person would rely. . . . Similarly, whether a complainant has consented to intercourse depends upon her manifestations of such consent as reasonably construed. If the conduct of the complainant under all the circumstances should reasonably be viewed as indicating consent to the act of intercourse, a defendant should not be found guilty because of some undisclosed mental reservation on the part of the complainant. Reasonable conduct ought not to be deemed criminal.

"It is likely that juries in considering the defense of consent in sexual assault cases, though visualizing the issue in terms of actual consent by the complainant, have reached their verdicts on the basis of inferences that a reasonable person would draw from the conduct of the complainant and the defendant under the surrounding circumstances. It is doubtful that jurors would ever convict a defendant who had in their view acted in reasonable reliance upon words or conduct of the complainant indicating consent, even though there had been some concealed reluctance on her part. If a defendant were concerned about such a possibility, however, he would be entitled, once the issue is raised, to request a jury instruction that the state must prove beyond a reasonable doubt that the conduct of the complainant would not have justified a reasonable belief that she had consented." (Citation omitted.) Id., 140–41. Although *Smith* supports the notion that a defendant is entitled to request an instruction that the state must prove beyond a reasonable doubt that the conduct of the victim would not have justified a reasonable belief that

she had consented, our Supreme Court has declined to hold that there is a constitutional requirement that the court must give such an instruction whenever consent is placed in issue in a sexual assault case. *State* v. *Jeffrey*, 220 Conn. 698, 718, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992).

Here, the record reflects that the defendant argued to the jury that the victim's ambiguous behavior toward him was tantamount to her consent to the sexual assault. On appeal, he claims that because that defense was raised and he requested a jury instruction that incorporated the reasonable belief aspect of consent, it was improper for the court to reject the portion of his requested charge to the effect that the state had the burden of proving beyond a reasonable doubt that the victim's conduct would not have justified a reasonable belief in the defendant that she had consented to the behavior with which he was charged. We believe that neither *Smith* nor *Jeffrey* mandates the proposition urged on us by the defendant. Rather, we conclude that a fair reading of those cases indicates that they stand for the proposition that if a defendant requests a charge on reasonable belief and has fairly put the issue of consent before the jury, then it would be appropriate for the court to give such a charge. Neither case, however, indicates that such a charge would be mandatory if properly requested and if the issue is fairly before the jury. We do not need to reach that question in this instance because, in our view, a fair reading of the record does not support the defendant's claim in his argument to the jury that consent reasonably was at issue.

Our review of the record reveals no evidentiary basis from which a reasonable fact finder could have determined that the victim had consented to the defendant's behavior toward her on the evening in question, either

by her words or actions. On the contrary, the record reveals undisputed testimony that not only did the victim repeatedly rebuff the defendant's advances, but also that the defendant used force to overcome her resistance to accomplish his criminal purposes on the evening in question. The defendant claims that the victim's failure to tell Anita Cotton of prior incidents, together with her failure to hang up when he telephoned her to make sexual conversation, is evidence of her ambiguous behavior toward him. Even if her silence about those past incidents could be taken as acquiescence by her, as we have stated, a victim's acquiescence cannot reasonably be equated to consent. See *State* v. *Brown*, 59 Conn. App. 243, 251–52, 756 A.2d 860 (2000), appeal dismissed, 256 Conn. 740, 775 A.2d 980 (2001). Simply put, notwithstanding the defendant's argument to the jury, there was no evidentiary basis on which the jury could have concluded that the defendant could have misapprehended the victim's attitude toward his advances. Because the record is devoid of any evidentiary basis on which the jury reasonably could have concluded that the victim evinced any ambiguity about the defendant's assaultive behavior, it was not improper for the court to decline to give the consent charge requested by the defendant.

## II

The defendant next claims that the court improperly failed to give a requested jury instruction that the 1998 Thanksgiving Day incident and sexual telephone conversations could be used by the jury as evidence of the defendant's reasonable belief that the victim had consented to sexual intercourse. We disagree.

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by

its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Ali*, 233 Conn. 403, 422, 660 A.2d 337 (1995).

At trial, the prosecution proffered evidence of the 1998 Thanksgiving Day incident as prior misconduct demonstrating a motive or common scheme on the defendant's part to sexually assault the victim. The court then cautioned the jury that the defendant was not being charged with the 1998 events and that evidence of that prior incident had been offered by the state solely on the issue of the defendant's motive in connection with the current charges.

Later, during cross-examination of the victim, the defendant elicited evidence of a history of sexually oriented telephone conversations with the defendant. In response to the evidence of the Thanksgiving Day incident and telephone conversations, the defendant requested the following jury instruction:

"The state has offered evidence of interactions between [the defendant] and [the victim] that occurred before September 19, 1999. The state claims that such evidence supports the allegations in this case. The defendant claims that such evidence refutes those allegations.

"Evidence of prior conduct was not admitted to prove the bad character of the defendant or his tendency to commit criminal acts. It may be not be used for that purpose. The state introduced such evidence because

the state claims that such evidence establishes a motive and common scheme in the commission of criminal acts. The defendant claims that such evidence puts the events of September 19, 1999 in a proper context. It is up to you the jury to decide (1) if such acts occurred, and (2) if they occurred, do they establish a motive or common scheme of criminal conduct or do they refute the [victim's] claims. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity.

"You may consider such evidence if you believe it and further find it logically, rationally and conclusively supports motive or common scheme or establishes a context for your evaluation of the events on September 19, 1999. Certainly, you may choose to disbelieve such evidence. You must understand, however, that even if you believe that such incidents took place, you must decide what it does or does not establish in this case. Ultimately, it is for you to decide what weight if any to give this evidence, and also to decide whether it establishes or refutes the [victim's] claims."

The court did not accede to the defendant's request. The following instruction was given by the court:

"Now, the state has offered evidence that on Thanksgiving night in 1998, some ten months prior to the date of the alleged incident in this case, when [the victim] was staying overnight at [the defendant's] home, that the defendant engaged in certain sexual activity with [the victim] against her wishes and also that he made several telephone calls of a sexual nature to [the victim] sometime prior to September of 1999. Now, that evidence offered by the state is not admitted to prove the bad character of the defendant or his tendency to commit criminal acts. Such evidence is being admitted solely to show or establish a scheme in the commission

of criminal acts and a motive for the commission of the crimes. The motive which the state claims that the evidence shows is that the defendant had a continuing sexual interest in [the victim]. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. The defendant claims that such evidence puts the events of September 19, 1999 in a proper context. *It is up for you—it is up to you, the jury, to decide, one, if such acts occurred and, two, if they occurred, do they establish a motive or common scheme of criminal conduct or do they refute [the victim's] claims.* You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports a motive or common scheme for your evaluation of the events of September 19, 1999. *On the other hand, if you do not believe such evidence or, even if you do, if you find that it does not logically, rationally and conclusively support the issue for which it is being offered by the state, then you must not consider the testimony for any purpose."* (Emphasis added.)

The defendant contends that the italicized portion of the instruction was given in error, as it improperly limited the purposes for which the jury could use the proffered evidence. Although it is not entirely clear from the language of the requested charge, it is apparent that the defendant did not want the jury's consideration of that evidence limited as instructed by the court on the basis of the defendant's argument that the victim's "participation" in the prior events could be considered by the jury as a historical backdrop to the events of September 19, 1999, and, in that regard, that her acquiescence in those prior instances could be viewed as reasonably leading the defendant to believe that she had consented to the events of September 19, 1999. We reject that proposition as devoid of merit.

As stated previously, the uncontradicted evidence indicated that the victim did not consent to the defendant's actions on September 19, 1999, that formed the basis of the criminal charges. Even if we assume arguendo that the evidence could support a determination that the victim had consented to the defendant's prior conduct, her prior consent would not be probative as to whether she had consented to the subsequently charged behavior, especially where the evidence demonstrates that she did not. See, e.g., *State* v. *Siering*, 35 Conn. App. 173, 178–85, 644 A.2d 958 (noting that consent can be withdrawn at any time, even after initially consensual intercourse has commenced), cert. denied, 231 Conn. 914, 648 A.2d 158 (1994).

We conclude that the court properly declined to deliver the requested instruction and that the instruction it gave concerning the uncharged prior misconduct conformed to the evidence presented, was correct in law and was adapted to the issues.

III

The defendant next raises a claim of double jeopardy. He was charged with and convicted of seven counts, including the crimes of unlawful restraint in the second degree and kidnapping in the first degree. The defendant claims that his conviction of both of those offenses arose out of the same transaction or occurrence and constituted double punishment for the same offense, thereby violating his fundamental constitutional rights under the fifth amendment to the United States constitution and article first, § 9, of our state constitution. We disagree. Because the claim presents an issue of law, our review is plenary. See *State* v. *Butler*, 262 Conn. 167, 174, 810 A.2d 791 (2002).

A substituted long form information was filed on September 19, 2001, charging the defendant with seven counts. In the first count of the information, which

alleged unlawful restraint in the second degree, the state charged that "at the City of New Haven, on or about the 19th day of September, 1999, between 10:00 p.m. and 11:00 p.m., in the area of Dixwell Avenue, the [defendant] did restrain another person, said conduct being in violation of Section 53a-96 (a) of the Connecticut General Statutes."

In the second count of the information, which alleged kidnapping in the first degree, the state alleged that "at the City of New Haven, on or about the 19th day of September, 1999, between 10:00 p.m. and 11:00 p.m., in the area of the Martin Luther King School on Dixwell Avenue, the [defendant] abducted another person (to wit: [the victim]) and he restrained that person with the intent to violate or abuse her sexually, said conduct being in violation of Section 53-92 (a) (2) (A) . . . ."

The defendant was found guilty of both charges and was sentenced accordingly. Although the defendant did not preserve his claim for appellate review, we find that it is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as the record is adequate for review, and the claim is of constitutional magnitude and of a nature that has been found to meet the *Golding* requirements automatically. See *State* v. *Hill*, 237 Conn. 81, 98–99, 675 A.2d 866 (1996); *State* v. *Tweedy*, 219 Conn. 489, 494 n.7, 594 A.2d 906 (1991); see also *State* v. *Barber*, 64 Conn. App. 659, 671, 781 A.2d 464 ("[i]f double jeopardy claims arising in the context of a single trial are raised for the first time on appeal, these claims are reviewable"), cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001).

"The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . This constitutional provision is applicable to the states through the due

process clause of the fourteenth amendment. . . . This constitutional guarantee serves three separate functions: (1) It protects against a second prosecution for the same offense after acquittal. [2] It protects against a second prosecution for the same offense after conviction. [3] And it protects against multiple punishments for the same offense [in a single trial]." (Internal quotation marks omitted.) *State* v. *Sanchez*, 75 Conn. App. 223, 232, 815 A.2d 242, cert. denied, 263 Conn. 914, 821 A.2d 769 (2003). "[Our Supreme Court has] also held that the due process guarantees of article first, § 9, of the Connecticut constitution include protection against double jeopardy." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 74 Conn. App. 580, 595, 814 A.2d 384, cert. denied, 263 Conn. 915, 821 A.2d 771 (2003).

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . The traditional test for determining whether two offenses are the same offense for double jeopardy purposes was set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Porter*, 76 Conn. App. 477, 484, 819 A.2d 909, cert. denied, 264 Conn. 910, 826 A.2d 181 (2003).

The substituted long form information suggests that two crimes, unlawful restraint in the second degree and kidnapping in the first degree, occurred between 10

p.m. and 11 p.m. in the area of Dixwell Avenue in New Haven though not at the same location. The information charged that the unlawful restraint in the second degree took place "in the area of Dixwell Avenue" and that the kidnapping took place "in the area of the Martin Luther King School on Dixwell Avenue . . . ." Thus, the defendant's claim that those two counts stem from the same transaction is incorrect factually. Because those two counts did not arise out of the same transaction, the defendant's conviction of each did not violate his constitutional rights against double jeopardy.

"Double jeopardy prohibits multiple punishments for the same offense in the context of a single trial. Nonetheless, distinct repetitions of a prohibited act, however closely they may follow each other; *Blockburger* v. *United States*, [supra, 284 U.S. 302]; may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]. . . .

"In [*State* v. *Tweedy*, supra, 219 Conn. 489, our Supreme Court] concluded that two convictions of robbery in violation of General Statutes § 53a-133 did not violate the prohibition against double jeopardy even when the charged offenses both had arisen within thirty minutes and during a continuous intimidation by a defendant's unceasing forcible conduct. . . . [*State* v. *Tweedy*, supra, 497. That court] concluded that because § 53a-133 defines robbery as, when, in the course of committing a larceny, the defendant engages in forcible conduct with a proscribed purpose . . . [t]he legisla-

ture . . . expressly designated the course of committing a larceny, rather than the course of forcible conduct, as the time frame for completion of the offense of robbery. . . . Id., 498–99. [That court] held, therefore, that the defendant committed two completed and hence separately punishable offenses of robbery as defined by § 53a-133. Id., 499." (Internal quotation marks omitted.) *State* v. *Miranda,* 260 Conn. 93, 122–23, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002).

Our review of the record reveals that the jury reasonably could have concluded that the two counts implicated two distinct criminal transactions. A reasonable view of the evidence supports the conclusion that the first transaction, subsequently charged as unlawful restraint in the second degree, occurred when the defendant, while driving the victim home, stopped his vehicle at the side of the road on Dixwell Avenue and shut off the engine. He then propositioned the victim for sex and, when she declined, began to masturbate. The victim pleaded to be taken home until the defendant complied.[1]

There was evidence from which the jury could have concluded that the second transaction, subsequently charged as kidnapping in the first degree, occurred a short time after the first incident. The defendant, still driving along Dixwell Avenue, drove into the parking lot of the Martin Luther King School and shut off the engine. He reached over and attempted to slide his hand

---

[1] Although the defendant does not claim that there was insufficient evidence to convict him of unlawful restraint in the second degree, we believe the jury could have reasonably concluded that he had restrained the victim within the meaning contemplated by General Statutes § 53a-96 (a) through his conduct of altering the intended driving route, his subsequent behavior in the vehicle, and by taking into consideration the victim's physical and mental limitations and her attendant need to be conducted from place to place.

between the victim's legs to touch her vagina. The victim resisted and asked the defendant to "stop." The defendant then reached into the victim's blouse and groped her breasts. The two began to "tussle" and "wrestle" inside the car, with the defendant imploring her to cooperate. The victim continuously resisted and repeatedly told the defendant, "no." The melee ended when the defendant's watchband broke and he frantically searched for the pieces.

Those two incidents each gave rise to a separate criminal charge. There is no indication that there was any overlap in the charges, only a close proximity in time between the incidents. Our Supreme Court in *State* v. *Tweedy*, supra, 219 Conn. 494–96, found no double jeopardy problem with the defendant in that case being convicted of two counts of robbery, because, inter alia, there was an intervening act of sexual assault. In this case, there also was an intervening act, i.e., the defendant began to drive the victim home after the first incident, thereby terminating any unlawful restraint and completing the commission of that crime. When the defendant later drove into the school parking lot, he commenced the commission of another crime, kidnapping in the first degree, which was distinct from the first crime. As a consequence, the defendant's claim that his conviction of both kidnapping in the first degree and unlawful restraint in the second degree violated his right against double jeopardy fails.

IV

The defendant next claims that certain comments made by the prosecutor during closing argument to the jury improperly shifted the burden of proof to the defendant and infringed on his right not to testify. Additionally, the defendant claims that in argument to the jury, the prosecutor improperly vouched for the credi-

bility of its key witness and disparaged the defendant's theory of defense.

"Our standard of review concerning claims of prosecutorial misconduct is well settled. Our Supreme Court has previously acknowledged that prosecutorial misconduct can occur in the course of closing argument. . . . [T]o deprive a defendant of his constitutional right to a fair trial . . . the prosecutor's conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Young*, 76 Conn. App. 392, 403, 819 A.2d 884, cert. denied, 264 Conn. 912, 826 A.2d 1156 (2003).

"In order to determine whether claims of prosecutorial misconduct amounted to a denial of due process, we must decide whether the challenged remarks were improper, and, if so, whether they caused substantial prejudice to the defendant. . . . The defendant bears the burden of proving that the prosecutor's statements were improper in that they were prejudicial and deprived him of a fair trial. . . . The ultimate question is . . . whether the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. . . . This final determination requires . . . the consideration of several factors: the extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the strength of the curative measures adopted and the strength of the state's case." (Citations omitted; internal quotation marks omitted.)

*State* v. *Dubose*, 75 Conn. App. 163, 178–79, 815 A.2d 213, cert. denied, 263 Conn. 909, 819 A.2d 841 (2003).

A

The defendant's first claim is that certain of the prosecutor's statements improperly shifted the burden of proof onto the defendant and were improper comments reflecting on the defendant's failure to testify. We are not persuaded.

In closing argument to the jury, the prosecutor stated: "[W]hat evidence is there or has there been presented in any fashion that would suggest what it was that was in the defendant's mind based upon those actions? What evidence do you have to draw any reasonable beliefs as to what was in the defendant's mind or what kind of message, as [defense counsel] keeps talking about, the defendant was receiving? Where's the evidence that talks about that?"

The defendant claims that those statements focused the jury's attention solely on the lack of evidence of the defendant's state of mind in relation to his belief about whether the victim had consented. Accordingly, the defendant urges, those statements shifted the burden of proving lack of consent from the state to the defendant. Because the defendant was the only person besides the victim who could have presented evidence as to what was in his mind, he claims that it is highly likely that the jury took the prosecutor's remarks as relating to the defendant's failure to testify.

"Comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the federal constitution. . . . In its closing argument, however, the state may properly call to the attention of the jury any portion of the evidence that stands uncontradicted. Such a comment becomes objectionable only when it focuses the attention of the

jury on the failure of the defendant to testify . . . . In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent we have espoused the following criterion. . . . Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" (Citations omitted; internal quotation marks omitted.) *State* v. *Washington*, 28 Conn. App. 369, 376–77, 610 A.2d 1332, cert. denied, 223 Conn. 926, 614 A.2d 829 (1992).

"[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) Id., 377–78.

We do not believe the statements in question carried the implication that the defendant asserts. Rather, we view the prosecutor's argument in that regard merely as commentary on the evidence, or lack thereof, in the case to support the defendant's argument on consent. Contrary to the defendant's claims on appeal, we believe that the challenged comments were not such that the jury would naturally and necessarily consider them to be comments on the defendant's failure to testify. "We believe the challenged remarks on rebuttal could only be reasonably interpreted as commentary by the prosecutor on the overall quality of the defendant's evidence and not as calling specific attention to the failure of the accused to testify. . . . The state made all of the challenged comments on rebuttal in the context of defense counsel's closing argument, and not in regard to the defendant's failure to testify. The portions of the state's argument attacked by the defendant obviously were intended by the state to demonstrate that defense counsel had failed to contradict critical por-

tions of the state's evidence in his final argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 535, 610 A.2d 1113 (1992).

## B

The defendant next claims that the prosecutor, in closing argument to the jury, improperly vouched for the state's key witness.[2] We disagree.

---

[2] The language the defendant challenges reads: "Normally, that's not the kind of a significant thing for most witnesses or most people, but I'd ask you to keep in context, given [the victim's] limited intellectual capabilities and her handicaps in those regards, and I would submit that that type of questioning must be viewed in that light . . . . I would submit to you, by her own response, that you must consider any of the inconsistencies between what she said on direct [examination] and what she said on [cross-examination] in light of those intellectual limitations. I also would suggest to you in considering her limitations as being relevant in terms of the implicit suggestion here by counsel that she somehow invited this and that she consented to it and it was guilt, in essence, or fear of discovery that led her to make this kind of complaint. Do you think that [the victim], the person that testified in this courtroom, had the capabilities of creating as complex a story as took place here? . . .

"Do you believe that [the victim] was clever enough to say, you know, all the sudden, I'm thinking I might be caught by Anita Cotton; therefore, what I should do is indicate I've been raped? Why not just let it be silent. . . . And then do you think she was clever enough to say, well, I'd better make this good, so I'd better tell a couple of people first . . . . Was she then clever enough to say, you know, besides that, I should tell Anita, and is it going to be that I'm willing to endure having to go down to a police station—keep in mind what her limitations are—talk to a stranger, who is a police officer, in a totally unique environment, discuss these kinds of details, create them out of whole cloth and then, after that, you know, to make it look good, I guess I better make an appointment at a health center . . . . Do you think that [the victim] has that capability, has that intellectual level to do that? And then to say, I'm willing to go through all of this and, in conclusion, that she was going to come into this courtroom . . . swear to tell the truth, go under oath, subject herself to cross-examination about some of the most graphic and intimate details that a person could possibly talk about . . . .

"I wondered if her disabilities might work against her in some fashion. You know, it's that very testimony that made me realize that it was precisely because of her disabilities that the defendant believed he could engage in the conduct that he's accused of and get away with it."

"The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 713, 793 A.2d 226 (2002).

In essence, the challenged language used by the prosecutor in his closing argument questioned whether the victim had the mental ability to invent a fictional complaint, as the defendant had suggested. Our review of the record leads us to believe that this comment did not constitute an improper vouching for the victim; rather, the comment may reasonably be understood as an effort by the prosecutor to remind the jury of the evidence regarding the victim's intellectual and emotional limitations when assessing her testimony.

In the context of the entire argument, we do not find the subject comment as an expression by the prosecutor of his opinion of the victim's credibility. Instead, we view it as a permissible jury argument that in light of the evidence before it of the victim's intellectual capabilities, the circumstances of the sexual assault, its aftermath and the testimony of the constancy of accusation witnesses, the jury could and should believe her. We conclude, therefore, that the prosecutor's argument in that regard did not infringe on the defendant's constitutional right to a fair trial.

C

The defendant's final challenge to the state's closing arguments is that certain language employed by the

prosecutor unconstitutionally disparaged the defendant's theory of defense. We find that argument to be without merit.

The language challenged reads: "[Defense counsel] wants you to go into this land, almost like a page out of Alice through the looking glass, where up is actually down and down is actually up, and nothing seems the way it is. . . . [Defense counsel] would have you take . . . [the victim's] anxiety and angst about telling Ms. Cotton . . . with the old up is down and down is up, by saying, hey, she was floating a trial balloon."

Our vigilance concerning prosecutorial misconduct does not lead us to a desire to exclude rhetoric from oral advocacy. We view that portion of the prosecutor's argument as no more than an observation, albeit colorful, that to find the defendant not guilty, the jury would essentially have to ignore the pervasive evidence of the defendant's guilt. The argument was not improper.

## V

The defendant's next claim is that the evidence introduced at trial was insufficient to support his conviction of two counts of unlawful restraint in the first degree in violation of § 53a-95.[3] Specifically, he claims there was no evidence of restraint or exposure to a substantial risk, the two elements of the crime that the statute contemplates. We are not persuaded.

"The standard of review of an insufficiency claim is twofold. We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the

---

[3] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 74 Conn. App. 589–90.

## A

In the fourth count of the long form information, the state alleged that "at the City of New Haven, on or about the 19th day of September, 1999, between 10:00 p.m. and 11:00 p.m., in the area of the Martin Luther King School on Dixwell Avenue, the [defendant] did restrain another person under circumstances which exposed such other person to a substantial risk of physical injury, said conduct being in violation of Section 53a-95 (a) of the Connecticut General Statutes." That charge of unlawful restraint in the first degree stemmed from the incident in the defendant's car while parked at the Martin Luther King School.

The defendant claims he did nothing to prevent the victim from leaving the vehicle at the time of the events in question and, as such, he never restrained her. Under the facts and circumstances of this case, we do not agree.

General Statutes § 53a-91 (1) defines "restrain" as "to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ."

As noted by the state, the evidence was amply sufficient to support the jury's determination that the defendant restrained the victim. Initially, the defendant interrupted the drive to the victim's home by departing

from the intended course of travel and detouring into the school parking lot. That was a substantial interference with the victim's liberty under the definition of "restrain," "by moving [her] from one place to another . . . without consent. . . ." General Statutes § 53a-91 (1). Next, the defendant physically accosted the victim by reaching between her legs and groping her breasts until his watchband broke. During that interval of time, the defendant effectively confined the victim to the front seat of the car. Further, given the location of the car on the side of the road, the victim's visual and mental disabilities, and mindful that it was nighttime, the jury could well have concluded that the victim had no realistic option of fleeing from the defendant's car.

In addition, the evidence also warranted the conclusion that the defendant subjected the victim to a substantial risk of physical injury. "To convict a defendant of unlawful restraint in the first degree, no actual physical harm must be demonstrated; the state need only prove that the defendant exposed the victim to a substantial risk of physical injury." *State* v. *Jordan*, 64 Conn. App. 143, 148, 781 A.2d 310 (2001). The evidence of the defendant's assault on the victim in the parking lot was ample to support a factual determination that by his behavior, the defendant exposed the victim to a substantial risk of physical injury. Accordingly, the jury could have reasonably concluded that the defendant was guilty of unlawful restraint in the first degree as a result of the incident in the Martin Luther King School parking lot.

B

The fifth count of the long form information alleged "that at the City of New Haven, on or about the 19th day of September, 1999, sometime after 11:00 p.m., in the area of 12-C Station Court, the [defendant] did restrain another person . . . under circumstances

which exposed such other person to a substantial risk of physical injury, said conduct being in violation of Section 53a-95 (a) of the Connecticut General Statutes." That charge of unlawful restraint in the first degree stems from the incident that occurred while the defendant and the victim were in her apartment.

The defendant again claims that there was no evidence that he restrained the victim or exposed her to a substantial risk of physical injury, as she permitted him to enter her apartment and she was never prevented by the defendant from leaving. The evidence is to the contrary.

From the evidence, the jury could have concluded that after the defendant left the victim's bathroom and went to her living room, he began to fondle her. Then, when the victim protested and opened the door to show the defendant out, he forcefully shut the door, picked her up, threw her to the couch and then sexually assaulted her. That evidence was sufficient for the jury to conclude that the defendant both restrained the victim and exposed her to a substantial risk of physical injury, and thereby supported his conviction of unlawful restraint in the first degree.

## VI

The defendant's final claim is that the evidence was insufficient to support his conviction of kidnapping in the first degree in violation of § 53a-92 (a).[4] We disagree.

To find the defendant guilty of kidnapping in the first degree in violation of § 53a-92, it was necessary for the jury to find, beyond a reasonable doubt, that the defendant had abducted the victim and restrained her

[4] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

with the intent to abuse her sexually. General Statutes § 53a-91 (2) defines "abduct" as "to restrain a person with intent to prevent his liberation by . . . (B) using or threatening to use physical force or intimidation."

The evidence presented to the jury was sufficient to find the defendant guilty of kidnapping in the first degree. The jury could have reasonably concluded that the defendant intentionally detoured from the route to the victim's house and entered the parking lot at the Martin Luther King School with the intent to abuse her sexually. The jury also could have reasonably concluded that the defendant relied on his size and physical presence to intimidate the victim and to compel her to remain inside the car. Accordingly, the evidence was sufficient to support the jury's determination that the defendant was guilty of kidnapping in the first degree.

The judgment is affirmed.

In this opinion the other judges concurred.