# Supreme Court of Florida

---

No. SC21-119

---

**GARRETT STATLER,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

October 13, 2022

COURIEL, J.

In this case we consider a facial challenge to the constitutionality of a provision of Florida's sexual battery statute, section 794.011(5)(b), Florida Statutes (2015). We are asked to decide whether it "must be read to include a requirement that the State prove that a criminal defendant knew or should have known the victim did not consent to sexual intercourse." *Statler v. State*, 310 So. 3d 133, 134 (Fla. 1st DCA 2020). We have jurisdiction because the First District Court of Appeal rejected the

constitutional challenge below, and in doing so expressly declared valid the sexual battery statute. Art. V, § 3(b)(3), Fla. Const.

We, too, find that the statute is constitutional. Subsection (5)(b) requires the State to prove, beyond a reasonable doubt, that the complainant in fact did not consent to sexual intercourse, but not that the defendant knew or should have known anything in particular about the complainant's subjective state of mind. Interpreting the sexual battery statute in this way does not violate a defendant's guarantee of due process under the Florida or United States Constitution. It does not remove the State's burden to prove the defendant's general intent to engage in the act that constitutes the offense under the statute. Because the State met that burden in this case, we approve the district court's decision affirming Statler's conviction.

## I

On April 15, 2016, A.B., a woman then twenty-two years old, met Jonathan Tait at a bar in Gainesville, Florida. After talking and flirting, Tait and A.B. agreed to return to Tait's apartment.

Arriving at the apartment, Tait and A.B. went to Tait's bedroom where they kissed and, as A.B. testified, began

"progressing" toward sexual intercourse. Later, upon finding out that Tait did not have any condoms, the couple walked to a nearby store. On the way, A.B. and Tait encountered three young men in the apartment complex's parking garage: Garrett Statler (Tait's roommate), Statler's brother, and Statler's friend.

A.B. testified that she smiled at the three men but denied introducing herself, speaking to them, touching them, or inviting them to accompany her and Tait anywhere. Tait likewise testified that A.B. did not speak to the three men, touch them, or engage in "any kind of flirtation." A.B. estimated the conversation lasted thirty seconds, and Tait testified that it lasted "only a few minutes."

Statler's brother testified that the conversation lasted closer to fifteen minutes, that A.B. was flirtatious and "got close" to all three men, and that A.B. asked the three men "[m]ultiple times" to "come up and party" with her and Tait. Statler's friend testified that A.B. was "pretty flirty" and "grabbed [his] waist." According to Statler's friend, A.B. was "flirtatious" and "touchy-feely" with Statler throughout the conversation.

After parting ways with the three men, A.B. and Tait continued to the convenience store, purchased condoms, and returned to

- 3 -

Tait's apartment alone. They entered Tait's bedroom and had consensual intercourse. At some point during their encounter, Tait stopped and left the room. It is undisputed that as Tait left the room, A.B. was lying stomach-down on the bed, facing the wall, back to the doorway. As he left, Tait told A.B. something along the lines of: "Stay right there. I'll be right back," or "Wait right there. I'll be right back."

Tait testified that he used the bathroom, then went to the other bedroom to talk to Statler and Statler's friend, who by then had arrived. Tait bragged to both men about his encounter with A.B. and said to Statler, "You could try if you want." According to Tait, Statler said nothing in response. He "just walked in[to Tait's bedroom]." Tait explained he "wasn't in [the other] bedroom more than 45 seconds, and [Statler] was already in my room." Tait did not follow Statler, but instead smoked a cigarette from the balcony connected to Statler's room.

After he finished his cigarette, Tait looked through the crack in his bedroom door and saw Statler having sex with A.B. Tait then "got out of there" and stood in the kitchen waiting for Statler to come out.

- 4 -

A.B. testified that she knew Tait had left the room because she felt him move off the bed and heard no one else breathing in the room; after he was gone, she remained facing the wall away from the doorway. Thirty seconds later, A.B. heard someone come in, then felt hands grab her hips. She "assumed that it was Tait coming back and we were going to finish."

Although the lights were on, her view was unobstructed,[1] and she was not heavily intoxicated or otherwise impaired, A.B. did not turn around when Statler pulled her close and began having intercourse with her. He never spoke or identified himself. A.B. testified that she had no reason "at all" to think it was not Tait. She told him to "go harder" several times and "it feels good." When it was over, she sank into the bed, still on her stomach and facing the wall.

Tait testified that Statler eventually stepped halfway out the bedroom door into the kitchen, whereupon Tait told him, "Hey, tell [A.B.] to leave." Tait then saw Statler go back into the bedroom.

---

1. A.B. testified that Statler was not wearing any kind of mask to conceal his identity, he never told her not to turn around, and he never held her head in place to prevent her from looking at him.

A.B. testified that the person behind her "laughed a little bit . . . like a nervous laugh," causing her to turn around. She then realized that he "was not the same person I was initially having sex with." A.B. testified that Statler was "grinning like he knew he did something bad" and "was waiting to see my reaction."

A.B. testified that once she realized "it was a different person" she "was overwhelmed." She "tr[ied] to gather [herself]" and put her pants on. Then, she said:

> [B]y the time I got my pants on, I knew that I was going to attack this person because what they did to me was attack me. So I wasn't going to attack him naked, so I put my pants on and I looked up at him and I said, You raped me.

A.B. testified that Statler

> looked at me and he said, What? No. We're just partying. And I said, No, you fucking raped me. And I got up and I tried to jump at him and claw at him. . . . I was trying to scratch him and do as much harm as I possibly could.

The fight spilled into the living room, with A.B. "chasing [Statler]" and "screaming at the top of [her] lungs." Tait intervened and pulled A.B. off Statler, carrying her back toward Tait's bedroom.

Once A.B. was separated from Statler, Tait handed A.B. her shirt and attempted to calm her, saying, "You're okay. It's fine. It's

all going to be fine." A.B. testified that she continued to scream at Tait, "No, it's not. You raped me." A.B. then attempted to call the police on her phone, but before she could talk to an operator, Tait took the phone from A.B. and hung up on the 911 operator. Tait then grabbed A.B. by the arm and physically threw her out of the apartment. Tait and Statler closed the door and locked A.B. outside.

A neighbor in another apartment heard "someone yelling for help" and "went upstairs to investigate." He testified that when he walked out of the stairwell, he saw A.B. "on the ground crying," with a "doe-in-headlights look." The neighbor described A.B. as "terrified," "scared of everything," and repeating the phrase, "It wasn't him." A.B. picked up her phone and called 911 a second time as the neighbor led her downstairs to his apartment. In the neighbor's apartment, A.B. spoke to the 911 dispatcher and stated she had been raped. A.B. waited in the neighbor's apartment until the police arrived. A.B. spoke to the police in the neighbor's apartment. They accompanied her to a hospital.

Based on these events, the State charged Statler with one count of sexual battery under subsection (5)(b). At trial, when the

State rested its case, Statler moved for judgment of acquittal. His counsel argued that

> in terms of intent, the state cannot refute a reasonable hypothesis of innocence that Mr. Statler believed that he had consent from the alleged victim, who was not physically incapacitated and whose physical response and all of the evidence that he could have had at the time suggested that it was a consensual act.

The trial court disagreed, noting that the "issue is not whether he believes he has consent," but "whether she gave consent." The trial judge continued:

> [T]he [element the State has] to prove is to beyond a reasonable doubt that she did not give consent. Whether he believes he has consent is not a defense. It goes to—it may go to the reasonable doubt in terms of the—all of those actions may give rise if the jury believes they have a doubt as to whether she gave consent, but the issue is not what he believed.

The trial court denied the motion for judgment of acquittal and moved on to discuss the verdict form and jury instructions. Statler did not object to the jury instruction listing the following elements of sexual battery:

> Number one, that Garrett Statler committed an act upon [A.B.] in which his penis penetrated or made contact with the vagina of [A.B.].
>
> Number two, that Garrett Statler'[s] act was committed without the consent of [A.B.].

> Number three, at the time of the offense, [A.B.] was 18 years of age or older.
>
> And number four, at the time of the offense Garrett Statler was 18 years of age or older.
>
> Consent means intelligent, knowing, and voluntary consent and does not include coerced submission. Consent does not mean the failure by the alleged victim to offer physical resistance to the offender.

The jury found Statler guilty of sexual battery as charged. The trial court sentenced Statler to eighteen months in prison, followed by ten years of sex-offender probation. Statler appealed.

The First District summarily affirmed Statler's conviction for sexual battery and wrote solely "to address his argument that Florida's sexual battery statute is facially unconstitutional or must be read to include a requirement that the State prove that a criminal defendant knew or should have known the victim did not consent to sexual intercourse." *Statler*, 310 So. 3d at 134. It rejected both contentions, citing *Watson v. State*, 504 So. 2d 1267, 1269 (Fla. 1st DCA 1986), for the proposition that "whether a defendant knew or should have known that the victim was refusing sexual intercourse is not an element of the crime of [sexual battery]." *Statler*, 310 So. 3d at 134 (quoting *Watson*, 504 So. 2d at

- 9 -

1269).  The district court continued that "the plain text of the statute supports [this] interpretation," and *Watson* is "well-established law" that "has not been questioned for decades."  *Id.* at 134-35.  Therefore, the First District held, the trial court correctly ruled that whether Statler believed he had consent was no defense to the crime of sexual battery.  *Id.*

On the matter of constitutionality, the First District noted that Statler relied on *State v. Giorgetti*, 868 So. 2d 512, 515 (Fla. 2004), for the proposition that "absent explicit statutory language, criminal statutes must be read to include a mens rea element."  *Statler*, 310 So. 3d at 134 (citing *Giorgetti*, 868 So. 2d at 515).  "However," the district court continued, "the Florida Supreme Court limited its holding in *Giorgetti* to statutes punishing otherwise 'innocent conduct,' such as failing to register as a sexual offender after relocating residences."  *Id.*  The First District reasoned that "[t]he crime of sexual battery under section 794.011(5)(b) is distinguishable from such 'innocent conduct.' "  *Id.*  "Therefore," the First District concluded, "based on our prior precedent in *Watson* and the inapplicability of *Giorgetti*, we disagree with [Statler] that

section 794.011(5)(b) is unconstitutional because it does not require the State to prove a defendant's mens rea." *Id.*

The First District affirmed Statler's conviction and declined to certify a question of great public importance. *Id.* This Court exercised discretionary review because the district court expressly declared valid subsection (5)(b).

## II

The First District's holding implicates issues of statutory interpretation and constitutionality, both of which we review *de novo*. *See Richards v. State*, 288 So. 3d 574, 575 (Fla. 2020) (statutory construction); *State v. Adkins*, 96 So. 3d 412, 416 (Fla. 2012) (constitutionality) (citing *Crist v. Ervin*, 56 So. 3d 745, 747 (Fla. 2011)).

The questions before us are: what, if anything, the State must prove about a defendant's criminal intent on the issue of the complainant's nonconsent in order to obtain a conviction under subsection (5)(b); and do the guarantees of article I, section 9 of the Florida Constitution and the Fourteenth Amendment to the U.S. Constitution permit the Legislature to have required what it in fact did in subsection (5)(b)? We answer that the Legislature made

sexual battery a crime of general intent, meaning that subsection (5)(b) includes no scienter requirement as to the complainant's nonconsent, and that this determination is safely within the Legislature's constitutional authority.

**A**

As a matter of statutory interpretation, the First District is correct that subsection (5)(b) does not require the State to prove that a criminal defendant knew or should have known the victim did not consent to sexual intercourse.

We begin, as always, from the premise that "[i]n construing this statute, this Court must give the 'statutory language its plain and ordinary meaning,' and is not 'at liberty to add words . . . that were not placed there by the Legislature.' " *McDade v. State*, 154 So. 3d 292, 297 (Fla. 2014) (quoting *Exposito v. State*, 891 So. 2d 525, 528 (Fla. 2004)). Subsection (5)(b) provides:

> A person 18 years of age or older who commits sexual battery[2] upon a person 18 years of age or older, without

---

2. Elsewhere, section 794.011 defines "sexual battery" as:

[O]ral, anal, or female genital penetration by, or union with, the sexual organ of another or the anal or female genital penetration of another by any other object;

- 12 -

that person's consent,[3] and in the process does not use physical force and violence likely to cause serious personal injury commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, s. 775.084, or s. 794.0115.

§ 794.011(5)(b), Fla. Stat. Notably absent from these words is any reference to the defendant's state of mind. "Nevertheless, silence on this point by itself does not necessarily suggest that [the Legislature] intended to dispense with a conventional *mens rea* element . . . . On the contrary, we must construe the statute in light of the background rules of the common law, in which the requirement of some *mens rea* for a crime is firmly embedded." *Staples v. United States*, 511 U.S. 600, 605 (1994) (citations omitted); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436 (1978) ("[T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal

---

however, sexual battery does not include an act done for a bona fide medical purpose.

§ 794.011(1)(j), Fla. Stat.

3. "Consent" under the statute means "intelligent, knowing, and voluntary consent and does not include coerced submission"; consent "shall not be deemed or construed to mean the failure by the alleged victim to offer physical resistance to the offender." § 794.011(1)(a), Fla. Stat.

jurisprudence." (quoting *Dennis v. United States*, 341 U.S. 494, 500 (1951))).  The language and structure of chapter 794, as well as the common law of rape from which it evolved, make plain that the crime of sexual battery set forth in subsection (5)(b) is a crime of general intent—that is, the statute requires the State to prove "no specific intent . . . other than that evidenced by the doing of the acts constituting the offense."  *Askew v. State*, 118 So. 2d 219, 222 (Fla. 1960).  Here, "the act constituting the offense" is the sexual battery, as defined in the statute; the absence of consent is an attendant circumstance (and a distinct element) separate from the act.

**1**

The plain language of subsection (5)(b) requires the State to prove that sexual contact occurred "without . . . consent."  But it does not, on its face, demand any proof of the defendant's subjective understanding of whether the complainant consented to the sexual act.

These two different questions—whether the complainant in fact consented to sex, versus whether the defendant knew or should have known that the complainant did not—seem close, especially

because some evidence may be relevant to either question.[4] But the statute only requires the State to establish the former, not the latter. As to the absence of consent, the determination that subsection (5)(b) puts to the jury depends not on the inner workings of each party's mind, but on how each party's state of mind is made manifest to the other. *Watson*, 504 So. 2d at 1269. As the high court of another state has held, it is the existence of consent, objectively manifested between the parties, and not the defendant's subjective perception of the complainant's thoughts, that is at issue. *See State v. Smith*, 554 A.2d 713, 717-19 (Conn. 1989) (examining this distinction in depth).

Because the existence or absence of consent is an objective determination to be made from facts observable by a reasonable person, the jury's finding must turn on what the complainant said and did. *See id.* at 717 (explaining that although "consent" is "commonly regarded as referring to the state of mind of the complainant in a sexual assault case, it cannot be viewed as a

---

4. A statement of affirmative consent from the complainant, for example, would be relevant both to the actual existence of consent and to each party's state of mind.

wholly subjective concept," so "a defendant should not be found guilty because of some undisclosed mental reservation on the part of the complainant," but instead, "whether a complainant has consented to intercourse depends upon [the complainant's] manifestations of such consent as reasonably construed"); *cf. State v. Ayer*, 612 A.2d 923, 926 (N.H. 1992) (noting that if a victim "objectively communicates lack of consent and the defendant subjectively fails to receive the message, [the defendant] is guilty," since the "appropriate inquiry is whether a reasonable person in the circumstances would have understood that the victim did not consent"). The question is whether the State has proven beyond a reasonable doubt, from the admissible evidence, that the defendant did not have a willing partner.

Here, the jury drew permissible inferences from the facts in evidence to determine that consent was absent—that A.B. was not a willing partner. Those facts included testimony about Statler's failure to identify himself upon entering the room where A.B. was waiting for Tait; about A.B.'s reactions upon learning that it had been Statler, and not Tait, who had engaged in intercourse with

her; and about Statler's conduct before, during, and after the episode.

Our construction and application of subsection (5)(b) fits into the provision's statutory context. The presence of an express requirement about the defendant's knowledge elsewhere in chapter 794—specifically, in some aggravating circumstances that elevate the crime to a felony of the first or second degree—supports the conclusion that the wording of subsection (5)(b) is no mistake, but a deliberate choice by the Legislature not to include a requirement about the defendant's subjective knowledge as to the element of nonconsent.[5] And consider section 794.08, Florida Statutes (2021) (criminalizing female genital mutilation), which requires that the

_____

5. Where subsection (5)(b) outlines the least serious, or "basic," crime of sexual battery—resulting in a felony of the second degree—section 794.011(4) lists various factors that, if present, increase the seriousness of the crime to a felony of the first degree. § 794.011(4), Fla. Stat. Two of these aggravating circumstances contain an express knowledge requirement. § 794.011(4)(e)(4), Fla. Stat. (elevating sexual battery to a felony of the first degree if the offender either "administers or has knowledge of someone else administering to the victim any [substance] that mentally or physically incapacitates the victim"); § 794.011(4)(e)(5), Fla. Stat. (doing the same if the "victim is mentally defective, and the offender has reason to believe this or has actual knowledge of this fact").

State prove beyond a reasonable doubt that the defendant acted knowingly. We do not presume that the Legislature would create a requirement of specific knowledge by omission in one section of chapter 794 when it affirmatively and expressly included such a requirement elsewhere in the same statute. *See Beach v. Great W. Bank*, 692 So. 2d 146, 152 (Fla. 1997) ("As a general rule, '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

The Legislature's treatment of other sexual crimes is also telling. Section 825.1025, Florida Statutes (2021), for example, criminalizes lewd or lascivious offenses committed upon or in the presence of an elderly or disabled person. The statute prohibits three categories of sexual activities, all of which contain an express requirement that the defendant knew or reasonably should have known that the elderly or disabled victim "either lacks the capacity to consent or fails to give consent." § 825.1025(4)(a), Fla. Stat. Plainly read, with the benefit of the context provided by these other

relevant statutory provisions, subsection (5)(b) does not contain the specific knowledge requirement that Statler says it does.

## 2

On what basis, then, do we conclude that it requires the State to prove any criminal intent at all?  The answer is that a correct reading of the statute acknowledges the long common-law tradition of treating rape as a crime of general intent.

At common law, rape was defined as (1) "the carnal knowledge of a woman" (2) "forcibly" and (3) "against her will."  4 William Blackstone, *Commentaries on the Laws of England* *210.  Florida adopted this common law conception of rape at its first territorial legislative session in 1822, enacting a law that provided:

> Any person or persons who shall have carnal knowledge of any woman, forcibly and against her will, shall be deemed guilty of rape, and upon conviction thereof, shall suffer death.

An Act for the Apprehension of Criminals and the Punishment of Crimes and Misdemeanors, § 21, Acts of the Legislative Council of the Territory of Florida, First Session (1822).  These three basic elements remained more or less unchanged for many decades.  As late as 1973, Florida's rape statute provided:

> Whoever ravishes or carnally knows a person of the age of eleven years or more, by force and against his or her will . . . shall be guilty of a life felony . . . .

§ 794.01(2), Fla. Stat. (1973).

And for just as long, this Court continued the common-law tradition of interpreting rape as a crime of general intent. *Askew*, 118 So. 2d at 222. As the crime of rape required no specific intent on the part of the defendant other than to have acted intentionally in performing the acts that constituted these common-law elements, we said that "the requisite intent [in a rape prosecution] is presumed or inferred from the act itself, [and therefore] voluntary intoxication is only a defense to the crime of rape when its use produces a mental condition of insanity." *Id.* (citing *Cochran v. State*, 61 So. 187, 190 (Fla. 1913)).

During the 1970s, in line with many other states, Florida replaced its resistance-based rape statute—requiring proof of carnal knowledge "against [the victim's] will"—with a statutory requirement that the State prove the absence of consent.[6] It repealed the rape

---

6. *See* Cassia C. Spohn, *The Rape Reform Movement: The Traditional Common Law and Rape Law Reforms*, 39 Jurimetrics 119 (1999).

statute—by then codified as section 794.01—in its entirety in 1974 and adopted the modern statutory scheme criminalizing "sexual battery." The 1974 statute defined sexual battery as:

> [O]ral, anal, or vaginal penetration by or union with the sexual organ of another; or the anal or vaginal penetration of another by any other object, provided, however, sexual battery shall not include acts done for bona fide medical purposes.

§ 794.011(1)(f), Fla. Stat. (Supp. 1974). It then provided that:

> A person who commits sexual battery upon a person over the age of eleven (11) years, *without that person's consent* and in the process thereof uses physical force and violence not likely to cause serious personal injury, shall be guilty of a felony of the second degree . . .

§ 794.011(5), Fla. Stat. (Supp. 1974) (emphasis added).

Significantly, the new statute did not affirmatively alter the State's burden as to the defendant's mental state.[7]

---

7. Although no case of ours from this period appears to pass upon the question, in *Buford v. State*, 492 So. 2d 355 (Fla. 1986), a homicide case, we determined that trial counsel was not ineffective for having failed to request an instruction on voluntary intoxication, where the State had proceeded under both a premeditation and a felony-murder theory. The felony-murder theory was

> based upon the fact that the murder occurred during the commission of a sexual battery. Intoxication would be a possible defense to the specific intent crime of premeditated murder *but not to felony murder since the*

- 21 -

Then, in 1992, the Legislature amended the sexual battery statute in response to this Court's opinion in *Gould v. State*, 577 So. 2d 1302 (Fla. 1991). In *Gould*, we passed upon section 794.011(5), which at the time provided that:

> A person who commits sexual battery upon a person 12 years of age or older, without that person's consent, and in the process thereof uses physical force and violence not likely to cause serious personal injury is guilty of a felony of the second degree[.]

*Id.* at 1304 n.4. We read this section to mean that "the actual use of some physical force beyond that which is required to accomplish the 'penetration' or 'union' is an essential element of [sexual battery as defined in] section 794.011(5)." *Id.* at 1305.

Within two years, the Legislature amended chapter 794 in two ways. It amended subsection (5) to provide:

> A person who commits sexual battery upon a person 12 years of age or older, without that person's consent, and in the process thereof does not use physical force and violence likely to cause serious personal injury is guilty of a felony of the second degree . . . .

---

*underlying felony—sexual battery—is not a specific intent crime.*

*Id.* at 359 (emphasis added) (citing *Askew v. State*, 118 So. 2d 219 (Fla. 1960)).

Ch. 92-135, § 3, at 1091, Laws of Fla. (codified at § 794.011(5), Fla. Stat. (1993)).[8]  And it added the following clarification on legislative intent as to the "basic charge of sexual battery":

> The Legislature finds that the least serious sexual battery offense, which is provided in s. 794.011(5), was intended, and remains intended, to serve as the basic charge of sexual battery and to be necessarily included in the offenses charged under subsections (3) and (4), within the meaning of s. 924.34; and that it was never intended that the sexual battery offense described in s. 794.011(5) require any force or violence beyond the force and violence that is inherent in the accomplishment of "penetration" or "union."

Ch. 92-135, § 2, at 1089, Laws of Fla. (codified at § 794.005, Fla. Stat.).

Since these amendments, the weight of the authority on the question has consistently favored the conclusion that the statute retained the general intent requirement that had prevailed at common law.  *See Boroughs v. State*, 684 So. 2d 274, 275 (Fla. 5th

---

8.  The Legislature enacted subsection (5)(b)—the provision under which Statler was convicted—in 2014.  *See* ch. 2014-4, § 3, at 5, Laws of Fla.  For the purposes of determining what the state must prove about a defendant's criminal intent on the issue of the complainant's nonconsent in order to obtain a conviction, subsection (5)(b) and subsection (5) following *Gould* are materially the same.

DCA 1996) (noting that "sexual battery is a general intent crime");

*Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 917 (11th Cir. 2004)

("[U]nder Florida law, sexual battery is a general intent crime and

does not require that a defendant act with specific intent."); *see also*

*Whitfield v. State*, 923 So. 2d 375, 379 (Fla. 2005) (holding that the

defense of voluntary intoxication was not available for general intent

crimes such as sexual battery).  Florida law on these questions

comports with the law of numerous states[9] and federal[10] law

regarding nonconsensual sex.

9. *See State v. Koperski*, 578 N.W.2d 837, 847 (Neb. 1998) (concluding that sexual assault is a crime of general intent, "[t]herefore, the only burden on the prosecution . . . is to prove beyond a reasonable doubt that the accused subjected another person to sexual penetration"); *Smith*, 554 A.2d at 717 (concluding that "no specific intent, but only a general intent to perform the physical acts constituting the crime, is necessary for the crime of first degree sexual assault"); *People v. Witte*, 449 N.E.2d 966, 971 n.2 (Ill. App. Ct. 1983) (finding that "the crime of rape must be understood as *not* including an element of knowledge of the woman's lack of consent, from which it follows that not every mistake by the defendant by which he believes the woman is consenting will be a defense" (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 47, at 358 (1972))); *State v. Bauer*, 324 N.W.2d 320 (Iowa 1982) (determining that a defendant's knowledge of his or her partner's lack of consent is not an element of Iowa's sexual abuse statute); *Com. v. Lopez*, 745 N.E.2d 961, 965 (Mass. 2001) ("Historically, the relevant inquiry has been limited to consent in fact, and no mens rea or knowledge as to the lack of consent has ever been required."); *State v. Elmore*, 771 P.2d 1192, 1193 (Wash. Ct. App. 1989) (holding that since the Legislature "chose not to include a degree of culpability as an element of rape," but instead "specifically included lack of consent," a knowledge requirement cannot be "inferred" into the statute); *People v. Langworthy*, 331 N.W.2d 171 (Mich. 1982) (listing cases to this effect).

10. *See United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (analyzing the similarly worded federal statute and holding that "Congress clearly intended a general intent mens rea"); *United States v. Lavallie*, 666 F.2d 1217, 1219 (8th Cir. 1981) ("Rape is a crime requiring general intent—only that indicated by the commission of the offense."); *United States v. Thornton*, 498 F.2d 749, 753 (D.C. Cir. 1974) (" 'Rape is not a crime which requires a specific intent.' This is in accord with the great weight of authority

**B**

We turn now to Statler's argument that, unless we read into it the particular subjective knowledge requirement that he proposes, subsection (5)(b) is facially unconstitutional because it lacks a mens rea requirement as to the nonconsent element, and therefore denies an accused due process.[11]

In weighing a challenge to a statute's constitutionality, we "accord legislative acts a presumption of constitutionality and . . . construe challenged legislation to effect a constitutional outcome whenever possible." *Adkins*, 96 So. 3d at 416-17 (quoting *Fla. Dep't of Revenue v. City of Gainesville*, 918 So. 2d 250, 256 (Fla. 2005)); *see also Giorgetti*, 868 So. 2d at 518 ("We are also obligated to

---

which holds the crime of rape requires no intent other than that indicated by the commission of the acts constituting the offense." (quoting *McGuinn v. United States*, 191 F.2d 477, 479 (D.C. Cir. 1951))).

11. Evaluating Statler's facial challenge to the constitutionality of subsection (5)(b), we set aside the fact that, in this particular case, the jury heard ample evidence from which it could conclude that consent was lacking, and that Statler had tricked A.B. into a nonconsensual encounter. Among other things, the jury heard that he entered the room voluntarily, did not identify himself, and laughed nervously when he was discovered.

construe statutes in a manner that avoids a holding that a statute may be unconstitutional." (citing *Gray v. Central Fla. Lumber Co.*, 140 So. 320, 323 (Fla. 1932))). When we say that a statute is facially unconstitutional, we mean "that no set of circumstances exists under which the statute would be valid." *Fla. Dep't of Revenue*, 918 So. 2d at 256.

We cannot say that here. For starters, "[g]iven the broad authority of the legislative branch to define the elements of crimes, the requirements of due process ordinarily do not preclude the creation of offenses which lack a guilty knowledge element." *Adkins*, 96 So. 3d at 417. It follows that

> [i]t is within the power of the legislature to declare conduct criminal without requiring specific criminal intent to achieve a certain result; that is, the legislature may punish conduct without regard to the mental attitude of the offender, so that the general intent of the accused to do the act is deemed to give rise to a presumption of intent to achieve the criminal result.

*Id.* at 418 (quoting *State v. Gray*, 435 So. 2d 816, 819-20 (Fla. 1983)). For the reasons we have discussed, the Legislature's reach did not approach the extent of its constitutional grasp, because the statute makes sexual battery as a crime of general intent, not a strict liability offense.

Long ago, the United States Supreme Court recognized that strict liability offenses would commonly be "found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of *mala in se.*" *United States v. Balint*, 258 U.S. 250, 252 (1922). Subsection (5)(b) would be an odd fit in that category, as it criminalizes not "wholly passive" conduct or conduct that might arguably be committed unwittingly, but indisputably active, purposeful conduct by the defendant. *Cf. Lambert v. California*, 355 U.S. 225, 226 (1957) (striking down on Fourteenth Amendment due process grounds a municipal ordinance that criminalized "any convicted person" who remained in Los Angeles for more than five days without registering with the city); *see also Giorgetti*, 868 So. 2d at 519-20 (reasoning from *Lambert* that sexual offender registration statutes include a requirement that the alleged offender knows of the obligation to register and maintain a current address).

We likewise reject Statler's argument that interpreting the statute as we do risks the criminalization of innocent conduct without due process of law. In a sexual battery case, it is the

State's burden to prove, beyond a reasonable doubt, the absence of consent. A jury's finding of guilt will therefore require the State to overcome any evidence of the complainant's willing participation contained in the record. In that regard, Florida law contains the same constitutional safeguards recognized by other states and federal courts as protections against the criminalization of innocent sexual activity. *See, e.g., State v. Elmore*, 771 P.2d 1192, 1193 (Wash. Ct. App. 1989) (noting that "having sexual intercourse with another person without his consent could not reasonably be mistaken to be an innocent act"); *United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019) (clarifying that "only *consensual* sexual intercourse is innocent").

### III

We approve the decision of the First District affirming Statler's conviction for sexual battery in violation of section 794.011(5)(b).

It is so ordered.

MUÑIZ, C.J., and CANADY, POLSTON, LABARGA, and GROSSHANS, JJ., concur.
FRANCIS, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal Statutory Validity

First District - Case No. 1D19-264

(Alachua County)

Jessica J. Yeary, Public Defender, Glen P. Gifford and Megan Long, Assistant Public Defenders, Second Judicial Circuit, Tallahassee, Florida,

for Petitioner

Ashley Moody, Attorney General, Henry C. Whitaker, Solicitor General, Jeffrey Paul DeSousa, Chief Deputy Solicitor General, David M. Costello, Assistant Solicitor General, and Steven Woods, Assistant Attorney General, Tallahassee, Florida,

for Respondent